# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

PAULA ANN BIFELT, as Personal Representative of the ESTATE OF TRISTAN PERCY VENT,

    Plaintiff,

vs.

STATE OF ALASKA, TROOPERS RONALD WALL, JACOB HAYUNGS, EDWARD HALBERT, and EDWIN CARLSON,

    Defendants.

4:18-CV-00017 JWS

ORDER AND OPINION

[Re: Doc. 21]

## I. MOTION PRESENTED

At docket 21 Defendants State of Alaska, Captain Ronald Wall, Trooper Jacob Hayungs, Trooper Edward Halbert, and Trooper Edwin Carlson (collectively, "the State") move for summary judgment on all claims filed against them by Plaintiff Estate of Tristan Percy Vent ("the Estate"). The Estate responds at docket 32. The State replies at docket 33. Oral argument was not requested and would not be of assistance to the court.

## II. BACKGROUND

This case is brought as a result of the fatal shooting of Tristan Percy Vent ("Vent") on September 8, 2015, during a standoff with Alaska State Troopers and Fairbanks Police Department officers. Vent had been stopped on suspicion of vehicle theft. He would not submit to arrest and possessed multiple firearms. Defendant

Troopers Wall, Hayungs, Halbert and Carlson ("the Troopers") are the officers on the scene who discharged their weapons at Vent around 40 minutes into the standoff. The Estate sued the Troopers in Count I of its amended complaint for excessive force under both § 1983 and state law. It sued the Troopers' employer, the State of Alaska, in Count II of the amended complaint for failure to train, re-train, supervise, investigate, and discipline the Troopers. The State moves for summary judgment on both counts. It argues that the Troopers are entitled to qualified immunity as to the state and federal excessive force claims against them. The State argues that the Estate's state law negligence claim against the State of Alaska is barred by statutory immunity.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[2] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[4]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[5] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary

---

[1] Fed. R. Civ. P. 56(a).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[5] *Id.* at 323.

judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[6] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[7] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[8] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[9]

## IV.  FACTS

The facts leading up to the shooting of Vent are undisputed. The State provided transcripts of the audio recorded during the encounter with Vent, as well as the audio itself.[10] It provided interviews of the various law enforcement officers involved.[11] It provided video footage of the incident that was captured by the dash camera in one of the law enforcement vehicles.[12] The video footage was then synched with the various audio recordings and provided as exhibits.[13] All of the evidence is consistent and clearly shows what occurred. The court's recitation of what happened is taken from these

---

[6]*Id.* at 323-25.

[7]*Anderson,* 477 U.S. at 248-49.

[8]*Id.* at 255.

[9]*Id.* at 248-49.

[10]Doc. 22-4 (Exhibit D); Doc. 22-5 (Exhibit E); Doc. 22-6 (Exhibit F); Doc. 22-7 (Exhibit G); Exhibit S.

[11]Doc. 22-8 (Exhibit H); Doc. 23-1 (Exhibit I); Doc. 23-2 (Exhibit J); Doc. 23-3 (Exhibit K); Doc. 23-4 (Exhibit L); Doc. 23-5 (Exhibit M).

[12]Exhibit O.

[13]Exhibit P; Exhibit R.

various sources. The Estate does not argue that any different scenario occurred, nor does it put forth a different version of the encounter.

Around 5:00 a.m., September 8, 2015, Trooper Halbert and another state trooper, Tyler Langford, drove out to the intersection of Potter Drive and Cripple Creek Road in Fairbanks, Alaska, to respond to reports of gunshots, an abandoned vehicle, and a stolen truck. At the intersection they found a Ford Bronco with both 9 mm and .40 caliber shell casings on the ground and on the vehicle. A nearby sign had been shot up. Neighborhood residents approached the troopers stating that they were the owners of a 2002 Red Ford Ranger that had been reported stolen in the early morning hours. After some investigation, the Troopers believed that the incidents in the neighborhood were related and whoever had stolen the Ford Ranger was the same person who had stolen and abandoned the Ford Bronco and shot at the street sign. They reported details about the stolen truck to dispatch and warned that the occupants were likely armed.

As the two troopers were returning to the station, they spotted a Red Ford Ranger turning onto David Road near some open fields. They followed the vehicle and confirmed through the license plate number that it was the stolen vehicle. Based on their investigation, they suspected that the occupants of the vehicle were likely armed with at least two firearms.[14] They conducted a stop of the vehicle. Vent was driving. He pulled over and the troopers stopped about 30 yards back and directed Vent to step out. Vent did not get out of the vehicle. He was moving around inside the cab. At one point he made a motion with his fingers like he had a gun. Trooper Halbert interpreted

---

[14] Doc. 22-8 (Exhibit H) at p. 6; Doc. 23-1 (Exhibit I) at p. 2.

the motion as Vent letting him know he had a gun.[15]  At some point Vent also informed the troopers that he had another firearm in a case in the truck.[16]

Numerous other law enforcement officers arrived at the scene, including Troopers Wall, Hayungs, and Carlson.  The officers commanded Vent to open the door and keep his hands up.  After some time, Vent opened the door and exited the vehicle, tossing a knit cap on the ground which had a handgun wrapped inside.  He got back inside the vehicle.  The law enforcement officers on the scene all indicated it was obvious that a handgun was inside the knit cap based on the metal scraping sounds it made along the ground.[17]  The officers continued to direct Vent out of the vehicle.  Vent shouted expletives at the officers.

When Vent eventually stepped out of the truck again, he remained by the driver's side door.  He gestured with his hands, drank from a water bottle, and yelled at the officers.  He did not comply with the officers' requests to step away from the truck.  He reached back into the truck despite the officers' warnings.  The officers continued to implore Vent to talk to them and calm down.  They told him that the situation was "not a big deal" and that they just need to "figure it out" with him.[18]

The officers believed at this point that they could coax Vent into complying and sent for a negotiator.  They also discussed amongst themselves various methods for ending the confrontation, including tasers and "less lethal" shots to the leg were he to

---

[15]Doc. 22-8 (Exhibit H) at p. 7.

[16]Doc. 22-8 (Exhibit H) at p. 8; Doc. 22-5 (Exhibit E) at p. 3; Doc. 22-6 (Exhibit F) at pp. 11, 13-15; Exhibit P at 26:11-13.

[17]Doc. 22-8 (Exhibit H) at pp. 8, 11; Doc. 23-1 (Exhibit I) at p. 16; Doc. 23-2 (Exhibit J) at p. 4; Doc. 23-3 (Exhibit K) at pp. 5-6; Doc. 23-4 (Exhibit L) at p. 4; Doc. 23-5 (Exhibit M) at p. 2.

[18]Doc. 22-5 (Exhibit E) at p. 11.

move to the back of the truck and away from the gun.[19] During this time, Vent continued to yell at the officers.

After about 14 minutes, Vent stepped toward the handgun on the ground and away from the door of the truck. He kicked the gun further away from the truck and went and leaned against the side of the truck bed. The officers saw these actions as a step toward cooperation, and one of the officers instructed the others not to hurry the situation.[20] They continued to request that he step to the back of the truck. Vent crouched down by the side of the truck. An officer told Vent that it looked like he wanted to cooperate and urged him to do so by moving towards them.[21] Vent eventually climbed on the tailgate and sat on the edge. The officers did not use less lethal methods to subdue him at this time. They indicated that he seemed to be making strides towards cooperation and was being "marginally cooperative," refusing arrest but sitting calmly.[22] They continued to talk him into submitting. One officer suggested running over to grab the gun on the street, but it was decided that the officers should wait given the unknown location of a second gun and uncertainty about whether anyone else was hiding in the cab.[23]

About thirty minutes into the encounter, Vent jumped off the tailgate and went back to the driver's side of the truck again. He threatened to grab the gun on the ground and multiple officers shouted at him. He walked over to the gun on the ground, standing over it with his hands on his head. They continued to shout "don't do it," and

---

[19]Doc. 22-5 (Exhibit E) at pp. 13-14.

[20]Doc. 22-5 (Exhibit E) at p. 16.

[21]Doc. 22-5 (Exhibit E) at p.17.

[22]Doc. 22-5 (Exhibit E) at p. 21.

[23]Doc. 22-5 (Exhibit E) at pp. 24-25.

"don't grab the gun," and "we don't want to shoot you."[24] Vent became more agitated, screaming and swearing. He told them that he wanted the officers to shoot him and that he could shoot the officers.[25] At this point, the officers told Vent he could walk down the road away from them. He walked closer to the truck, kicking the gun along with him on the ground. He continued to yell at the officers, and the officers tried to assure Vent that he was not in trouble and that he could walk down the road. Vent again threatened to start "shooting all you guys" and to shoot himself, and he stepped toward the gun.[26] They implored him to calm down and not touch the gun. He continued to talk about shooting the officers. Vent turned toward the driver's door and leaned into the truck. Vent then quickly spun around. He repeated this sequence, turning toward the door and then quickly spinning around toward the officers.

About forty minutes into the encounter, Vent was fidgeting near the gun. The officers implored him to come back and talk and assured him that they just wanted to check on him. Vent started jumping and stretching near the gun, as if limbering up. He walked up to the gun and stood over it. He reached down and, facing the officers, lifted it off the ground.[27] At this moment, multiple officers—Troopers Wall, Hayungs, Halbert, and Carlson— shot at Vent. As soon as Vent fell, the officers responded to give aide. Vent later died as a result of gunshots wounds.

## IV. DISCUSSION

**A. Excessive Force under Federal Law**

The Estate alleges that the Troopers, acting under the color of state law, used excessive deadly force in violation of Vent's Fourth and Fourteenth Amendment rights. The State argues that the Troopers are entitled to qualified immunity. Qualified

---

[24] Doc. 22-5 (Exhibit E) at pp. 26-27.

[25] Doc. 22-5 (Exhibit E) at p. 28.

[26] Doc. 22-5 (Exhibit E) at p. 30.

[27] Exhibit P at 41:25-30.

immunity offers complete immunity from suit for government officials sued in their individual capacities, as long as their conduct does not violate clearly established rights of which a reasonable person would have known.[28] It shields an officer from personal liability when that officer "reasonably believes that his or her conduct complies with the law."[29] That is, even if the officer's conduct is in fact "constitutionally deficient," qualified immunity protects him from suit if he "reasonably misapprehends the law governing the circumstances [he] confronted."[30] It operates to protect all but the plainly incompetent or those who knowingly violate the law.[31]

Whether qualified immunity applies requires a two-part analysis. First, the court must consider whether the conduct at issue violated a constitutional right. If no violation is found, the inquiry is complete.[32] Second, if a constitutional violation is found, the court must consider whether the violation was clearly established under the law at the time of the misconduct.[33]

**1. Reasonableness of Force Under the Forth Amendment**

The Fourth Amendment's reasonableness standard applies to an excessive force claim.[34] "The 'reasonableness' of a particular use of force must be judged from the

---

[28]*Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The court assumes that the Estate's § 1983 claim against the Troopers is brought against them in their individual capacities because state employees acting in their official capacities, like the Troopers, are absolutely immune from a § 1983 suit. *Howlett v. Rose*, 496 U.S. 356, 365 (1990); *Thornton v. Brown*, 757 F.3d 834, 839-40 (9th Cir. 2013).

[29]*Pearson*, 555 U.S. at 224.

[30]*Brosseau v. Haugen*, 543 U.S. 194,198 (2004).

[31]*Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

[32]*Pearson*, 555 U.S. at 232

[33]*Id.*

[34]*Graham v. Connor*, 490 U.S. 386, 395.

perspective of a reasonable officer on the scene."[35] The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[36] No one disputes the nature of the Fourth Amendment intrusion in this case. "The intrusiveness of a seizure by means of deadly force is unmatched."[37] Consequently, the analysis here turns on whether the interests at stake were sufficiently great to justify such force.

The strength of the officer's interest is measured by considering three factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[38] The inquiry however is not limited and depends on all the facts and circumstances confronting the officers, including the availability of less intrusive methods, whether proper warnings were given, and whether it should have been apparent that the person they used force against was emotionally disturbed.[39] Often excessive force cases are not amenable to summary judgment based on this prong of the qualified immunity analysis because there are usually disputed versions of events that require a jury to make credibility determinations and draw inferences to determine how events unfolded.[40] However, where the operative facts are undisputed, such as here, the issue of reasonableness is a question

---

[35]*Id.* at 396.

[36]*Id.* (internal quotation marks omitted).

[37]*Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

[38]*Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (internal quotations omitted).

[39]*Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011).

[40]*Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

of law for the court.[41] As explained more fully below, given the undisputed facts and circumstances confronting the Troopers on September 8, 2015, the government's interests in this case were sufficient to make the Troopers' use of deadly force reasonable.

First, as for the crime that precipitated the use of force, troopers were attempting to apprehend Vent for vehicle theft. Vent was driving the 2002 Ford Ranger truck that had been reported stolen. They suspected Vent had been the one to fire rounds at a street sign in the neighborhood where the Ford Ranger had been taken. The residents had called in reports of gunfire in the early morning hours and troopers had found 9 mm and .40 caliber shell casings surrounding the abandoned Ford Bronco that they suspected Vent had been driving before he stole the Ford Ranger. Thus, troopers were conducting a felony stop of an armed suspect, not simply a welfare check or traffic stop. Indeed, when Vent began to get out of the stolen truck, he tossed the handgun, which was placed inside a knit cap, onto the street near the driver's side of the truck and within lunging distance.

Second, Vent resisted arrest. The officers on scene actively sought Vent's cooperation for around 40 minutes. The officers tried to persuade Vent to talk to them and to walk away from the vicinity of the handgun. The officers offered to let Vent walk down the road, and he refused. He kicked the handgun around on the street. He reached into the vehicle against the pleas of the officers. He repeatedly swore at the officers. He yelled violent threats, shouting that he would "[f]ucking start shooting all you guys" and "shoot myself too."[42]

Third, the facts show that Vent posed an immediate threat to the safety of the officers. As noted above, the handgun remained in his vicinity for much of the standoff.

---

[41]*Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017).

[42]Doc. 22-4 at p. 15; Doc. 22-5 at p. 30.

He kicked at it, jumped around it, and talked about grabbing it. He threatened to shoot the officers throughout the encounter. He reached into the driver's side of the truck for unknown reasons and spun around quickly. The officers repeatedly implored Vent not to touch the gun and to walk away from the truck, but he did not comply. About 40 minutes into the standoff, as the video clearly show, Vent stood over the gun, bent over, picked it up off of the ground in the direction of the officers. At this point, multiple officers shot. Given all of these circumstances—the felonies committed, the continued resistance to cooperation, and, most importantly, the imminent threat faced in that moment—the use of deadly force was reasonable and therefore not in violation of Vent's Fourth Amendment rights.

Other relevant factors weigh in favor of finding reasonable use of force. The officers did not act rashly. They had a negotiator brought to the scene. They discussed how they could use less lethal means to end the standoff and attempted to get Vent to move away from the gun so they could employ those means safely. They refrained from using force when Vent reached into the driver's side of the truck and spun back around quickly to face the officers despite the risk from the second firearm. The officers gave adequate warnings to Vent, pleading with him not to touch the gun on the ground. While it was obvious to the officers that there was an issue with substance abuse or mental health given Vent's statements during the confrontation, such circumstances do not warrant a different balancing of interests here given the fact that the Troopers were faced with a raised gun.

The Estate argues that summary judgment is not warranted on the issue of whether the Troopers' use of deadly force violated Vent's Fourth Amendment. It argues that there are issues of fact as to the reasonableness of the Troopers' actions, relying on a report from its police practices expert. The expert concludes that law enforcement on the scene had an opportunity to subdue Vent without resorting to lethal methods. Contrary to the Estate's position, a plaintiff cannot avoid summary judgment by "simply producing an expert's report that an officer's conduct leading up to a deadly

confrontation was imprudent, inappropriate, or even reckless."[43] The reasonableness analysis does not turn on whether the officers might have had less intrusive means available to them or whether they could have taken a different course of action. "Imposing such a requirement would . . . entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment."[44]

The Estate also more generally argues that reasonableness should be an issue for the jury, particularly in light of the expert's report. In support it cites *Smith v. City of Hemet*, where the Ninth Circuit noted that the reasonableness of force is usually a question of fact for the jury.[45] However, the Estate's reliance on *Smith* is misplaced. The Ninth Circuit explained in that case that excessive force cases often go to a jury because the inquiry typically involves disputed factual issues and requires the jury to make credibility determinations.[46] The Supreme Court and Ninth Circuit have made clear that where the operative facts are undisputed, the issue of reasonableness is a question of law for the court.[47] Here, as noted above, there are no genuine disputes about what occurred. The Estate contends that the court cannot just accept the "self-serving" account provided by the officers and that a jury could draw its own inferences from the evidence. However, no reasonable juror could see what transpired differently. There is an abundance of video and audio evidence that clearly sets forth the series of

---

[43]*Billington v. Smith,* 292 F.3d 1177, 1189 (9th Cir. 2002) (holding that a plaintiff cannot "avoid[] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless"), *abrogated on other grounds by Cnty. of Los Angeles v. Mendez*, 137 S.Ct. 1539 (2017).

[44]*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

[45]394 F.3d at 701.

[46]*Id*.

[47]*Scott*, 550 U.S. at 381 n.8 (2007); *Lowry*, 858 F.3d at 1254; *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014) ("[T]he court must decide as a matter of law 'whether a reasonable officer could have believed that his conduct was justified.'").

-12-

events and the moments leading up to the deadly force. Indeed, the Estate does not point to any portion of the encounter where a juror could infer that something different happened, nor does it suggest that there are any inconsistencies or ambiguities between the various pieces of evidence that could create a disputed issue about a material fact.

**2. Clearly Established Law**

While the court concludes that the Troopers did not violate Vent's Fourth Amendment rights, it also finds that, regardless of the constitutionality of their actions, the Troopers would be entitled to qualified immunity here. As noted above, even if an officer's conduct is found to be unlawful, qualified immunity attaches unless the officer had fair notice that the force used would be unreasonable under the law. That is, the conduct must violate clearly established law. "Although [the Supreme Court's] caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the . . . question beyond debate."[48]

The Estate fails to identify any case where officers acting under similar circumstances—faced with a suspect grabbing a firearm off the ground— were held to have violated the suspect's Fourth Amendment rights. To the contrary, the case law supports the use of deadly force in such circumstances. It is well established that "[w]hen an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force."[49] Indeed, under the case law, even if a suspect does not point a gun directly at another, an armed suspect that makes a "furtive movement, harrowing gesture, or serious verbal threat" may pose an

---

[48]*White v. Pauly*, 137 S.Ct. 548, 551 (2018) (alterations and internal quotation marks omitted).

[49]*George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007)); *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) (finding that the officers' use of deadly force against a suspect who held a gun and pointed it at them was not constitutionally excessive).

-13-

immediate threat that justifies the use of deadly force.[50] Given such precedent, "[t]his is far from an obvious case in which any competent officer would have known that shooting [the suspect] . . . would violate the Fourth Amendment."[51]

**B. Excessive Force under State Law**

In addition to a § 1983 claim for excessive force, the Estate also asserts that the Troopers violated state law by using excessive deadly force against Vent. In Alaska, "[t]he use of excessive force is a statutory violation" and may violate the Alaska Constitution.[52] Officers faced with a state excessive force claim are also protected by qualified immunity. The state courts follow federal precedent when determining whether such immunity applies.[53] That is, qualified immunity shields an officer from an excessive force claim if his conduct was objectively reasonable or if the officer reasonably believed that his conduct was lawful. As discussed above, the court finds the Troopers' use of deadly force reasonable, and, even if the conduct could be deemed unreasonable, the Troopers reasonably believed that their conduct was lawful given that no federal or state case law, laws, or regulations put them on notice that shooting Vent under the circumstances would be deemed unlawful.

**C. Negligence for Failure to Train and Supervise**

The Estate alleges that the State of Alaska "grossly failed to train it's [sic] Troopers in the fundamental law of arrest and use of force" and "failed to properly and adequately train, re-train, supervise, investigate, and discipline individuals under its command or supervision, including the defendant Troopers," which resulted in Vent's

---

[50]*George*, 736 F.3d at 838; s*ee also Smith*, 394 F.3d at 704 ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.").

[51]*Kiesla v. Hughes*, 138 S.Ct. 1148, 1153 (2018).

[52]*Maness v. Daily*, 307 P.3d 894, 900-01 (Alaska 2013) (citing AS 12.25.070, AS 11.81.370).

[53]*Id.*

-14-

death.[54] The State argues that this claim is barred under Alaska's immunity statute, AS 09.50.250(3). That statute grants the State of Alaska absolute immunity for claims that arise "out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[55] "[T]here is no distinction between 'excessive force' and 'assault and battery' for purposes of the immunity statute."[34]

A plaintiff may not circumvent the immunity statute by framing the excessive force claim as one based on negligence in hiring, training, and supervision. In *B.R. v. State*, the Alaska Supreme Court held that claims which merely assert breaches of the State's duty to exercise due care in hiring, training, and supervision are barred by AS 09.50.250(3) because such claims depend on the tort offender's employment status.[35] Any negligence claim against the state for failure to protect against the actions of a tort offender must be based on the state's independent duty to provide protection and care.[36] No such independent duty is alleged here. The Estate's negligent training and supervision claim rests entirely on the State's status as the Troopers' employer.[37] Therefore, the claim is barred. Notably, the Estate did not address this argument in its response brief.

---

[54]Doc. 4-26 at ¶¶ 20-21.

[55]AS 09.50.250(3).

[34]*State, Dep't of Corrections v. Heisey*, 271 P.3d 1082, 1091 (Alaska 2012).

[35]144 P.3d 431, 435 (Alaska 2006).

[36]*Heisey*, 271 P.3d at 1092-93.

[37]*Id.*

-15-

## V. CONCLUSION

Based on the preceding discussion, the State's motion for summary judgment at docket 21 is GRANTED. The clerk is directed to enter judgment in favor of defendants on all counts.

DATED this 3rd day of March 2020.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT